**ATTACHMENT D**

**<u>INDEPENDENT COMPLIANCE MONITOR</u>**

As set forth in the Plea Agreement (the "Agreement"), Binance Holdings Limited (the "Company"), on behalf of itself and its subsidiaries and affiliates involved in the operation of the Binance.com exchange or with access to the Binance.com orderbook, has agreed to retain an independent compliance monitor (the "Monitor"). The duties and authority of the Monitor and the obligation of the Company with respect to the Monitor and the United States Department of Justice, Criminal Division, Money Laundering and Asset Recovery Section ("MLARS"); National Security Division, Counterintelligence and Export Control Section ("CES"); and the United States Attorney's Office for the Western District of Washington ("the USAO-WDWA") (collectively the "Offices") are as described below.

1.      The Company will retain the Monitor for a period of three years (the "Term of the Monitorship" or the "Term"), unless the provision for extension described in Paragraph 7 of the Company's Plea Agreement (the "Agreement") is triggered.

*Monitor's Mandate*

2.      The Monitor's primary responsibility is to assess and monitor the Company's compliance with the terms of the Agreement, including the Company's compliance programs, policies, procedures, codes of conduct, systems, and internal controls, including its anti-money laundering and U.S. sanctions compliance programs (the "Compliance Programs") in Attachment C, to specifically address and reduce the risk of any recurrence of the Company's misconduct. During the Term of the Monitorship, the Monitor will evaluate, in the manner set forth below, the effectiveness of the Company's Compliance Programs as they relate to its current and ongoing compliance with laws prohibiting money laundering, laws requiring anti-money laundering programs, and laws prohibiting violations of U.S. sanctions. In so doing, the

Monitor will take such reasonable steps as, in his or her view, may be necessary to fulfill the foregoing mandate (the "Mandate"). This Mandate shall include an assessment of the Company governing authority's and senior management's commitment to, and effective implementation of, the compliance commitments described in Attachment C of the Agreement.

*Company's Obligations*

3.      The Company shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the Company's Compliance Programs in accordance with the principles set forth herein and subject to applicable law, including applicable data protection and labor laws and regulations. To that end, the Company shall: facilitate the Monitor's access to the Company's documents and resources; not limit such access, except as provided in Paragraphs 5 and 6 below; and provide guidance on applicable local law. The Company shall provide the Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement. The Company shall use its best efforts to provide the Monitor with access to the Company's former employees, agents, intermediaries, consultants, representatives, distributors, licensees, contractors, suppliers, and joint venture partners (collectively, "agents and business partners"), as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement. The Company shall inform agents and business partners of this obligation.

4.      Any disclosure by the Company to the Monitor concerning violations of laws prohibiting money laundering, laws requiring anti-money laundering programs, or laws prohibiting violations of U.S. sanctions shall not relieve the Company of any otherwise

applicable obligation to truthfully disclose such matters to the Offices pursuant to the Agreement.

*Withholding Access*

5.      The parties agree that no attorney-client relationship shall be formed between the Company and the Monitor. In the event that the Company seeks to withhold from the Monitor access to information, documents, records, facilities, or current or former employees of the Company that may be subject to a claim of attorney-client privilege or to the attorney work-product doctrine, or where the Company reasonably believes production would otherwise be inconsistent with applicable law, the Company shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor.

6.      If the matter cannot be resolved, at the request of the Monitor, the Company shall promptly provide written notice to the Monitor and the Offices. Such notice shall include a general description of the nature of the information, documents, records, facilities, or employees that are being withheld, as well as the legal basis for withholding access. The Offices may then consider whether to make a further request for access to such information, documents, records, facilities, or employees. Any such request would be made pursuant to the cooperation provisions set forth in Paragraph 25 of the Agreement.

*Monitor's Coordination with the Company and Review Methodology*

7.      In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with Company personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis. The Monitor may rely on the product of the Company's processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Company, as well as the Company's internal resources (*e.g.*, legal, compliance, and internal audit), which can assist the

Monitor in carrying out the Mandate through increased efficiency and Company-specific expertise, provided that the Monitor has confidence in the quality of those resources.

8.      The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets. In carrying out the Mandate, the Monitor should consider, for instance, risks presented by:

a.      The countries and business areas in which the Company operates or in which its customers are located;

b.      The size of the Company and its business;

c.      The nature and volume of the financial services provided the Company;

d.      The nature of the Company's customers and transaction counterparties, including whether those customers and counterparties are natural persons, financial institutions, or financial intermediaries including mixing and tumbling services;

e.      The jurisdictions in which the Company is licensed;

f.      Current and potential agents and business partners, and the business rationale for such relationships;

g.      The failure of the Company, a global money transmitting business, to have effective Compliance Programs; and

h.      The extent to which the Company interacts with customers only over the Internet and not in person.

9.      In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things:

a.      Inspection of relevant documents, including the Company's current compliance policies and procedures;

b.      Direct observation of selected systems and procedures of the Company, including those related to know-your-customer, customer due diligence, U.S. sanctions screening, real-time transaction monitoring, law enforcement notifications, internal accounting controls, record-keeping, and internal audit procedures;

c.      Meetings with, and interviews of, relevant current and, where appropriate, former shareholders, officers, employees, agents and business partners, and other persons at mutually convenient times and places; and

d.      Analyses, studies, and testing of the Compliance Programs.

*Monitor's Written Work Plans*

10.     To carry out the Mandate, during the Term of the Monitorship, the Monitor shall conduct an initial ("first") review and prepare a first report, followed by at least two follow-up reviews and reports as described in Paragraphs 16 through 20 below. With respect to the first report, after consultation with the Company and the Offices, the Monitor shall prepare the first written work plan within sixty (60) calendar days of being retained, and the Company and the Offices shall provide comments within thirty (30) calendar days after receipt of the written work plan. With respect to each follow-up report, after consultation with the Company and the Offices, the Monitor shall prepare a written work plan at least thirty (30) calendar days prior to commencing a review, and the Company and the Offices shall provide comments within twenty (20) calendar days after receipt of the written work plan. Any disputes between the Company and the Monitor with respect to any written work plan shall be decided by the Offices in their sole discretion.

11.    All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents. The Monitor's work plan for the first review shall include such steps as are reasonably necessary to conduct an effective first review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement. In developing such understanding, the Monitor is to rely, to the extent possible, on available information and documents provided by the Company. It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

*First Review*

12.    The first review shall commence no later than one hundred twenty (120) calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Company, the Monitor, and the Offices). The Monitor shall issue a written report within one hundred fifty calendar (150) days of commencing the first review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the effectiveness of the Company's Compliance Programs as set forth in Attachment C. The Monitor should consult with the Company concerning his or her findings and recommendations on an ongoing basis and should consider the Company's comments and input to the extent the Monitor deems appropriate. The Monitor may also choose to share a draft of his or her reports with the Company prior to finalizing them. The Monitor's reports need not recite or describe comprehensively the Company's history or compliance policies, procedures, and practices. Rather, the reports should focus on areas the Monitor has identified as requiring recommendations for improvement or which the Monitor otherwise concludes merit particular

attention. The Monitor shall provide the report to the Company's governing authority and

contemporaneously transmit copies to the following representatives of the Offices or their

designees:

> Chief and Deputy Chief, Bank Integrity Unit
> Money Laundering and Asset Recovery Section, Criminal Division
> U.S. Department of Justice
> Bond Building, Tenth Floor
> 1400 New York Avenue, N.W.
> Washington, D.C. 20005
>
> Chief and Deputy Chief Counsel for Corporate Enforcement
> Counterintelligence & Export Control Section, National Security Division
> U.S. Department of Justice
> 950 Pennsylvania Avenue, N.W.
> Suite 7700
> Washington, D.C. 20530
>
> United States Attorney
> Western District of Washington
> 700 Stewart Street, Suite 5220
> Seattle, WA 98101

After consultation with the Company, the Monitor may extend the time period for issuance of the

first report for a brief period of time with prior written approval of the Offices.

13.     Within one hundred fifty (150) calendar days after receiving the Monitor's first

report, the Company shall adopt and implement all recommendations in the report. If the

Company considers any recommendations unduly burdensome, inconsistent with applicable law

or regulation, impractical, excessively expensive, or otherwise inadvisable, it must notify the

Monitor and the Offices of any such recommendations in writing within sixty (60) calendar days

of receiving the report. The Company need not adopt those recommendations within the one

hundred fifty (150) calendar days of receiving the report but shall propose in writing to the

Monitor and the Offices an alternative policy, procedure, or system designed to achieve the same

objective or purpose. As to any recommendation on which the Company and the Monitor do not

agree, such parties shall attempt in good faith to reach an agreement within forty-five (45) calendar days after the Company serves the written notice.

14.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Offices. The Offices may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination by the Offices, the Company shall not be required to implement any contested recommendation(s).

15.     With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred fifty (150) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Offices.

*Follow-Up Reviews*

16.     A follow-up ("second") review shall commence no later than one hundred and eighty (180) calendar days after the issuance of the first report (unless otherwise agreed by the Company, the Monitor, and the Offices). The Monitor shall issue a written follow-up ("second") report within one hundred twenty (120) calendar days of commencing the second review, setting forth the Monitor's assessment and, if necessary, making recommendations in the same fashion as set forth in Paragraph 12 above with respect to the first review. After consultation with the Company, the Monitor may extend the time period for issuance of the second report for a brief period of time with prior written approval of the Offices.

17.     Within one hundred twenty (120) calendar days after receiving the Monitor's second report, the Company shall adopt and implement all recommendations in the report, unless, within thirty (30) calendar days after receiving the report, the Company notifies in

writing the Monitor, and the Offices concerning any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable. With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred twenty (120) calendar days of receiving the report but shall propose in writing to the Monitor, and the Offices an alternative policy, procedure, or system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within thirty (30) calendar days after the Company serves the written notice.

18.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Offices. The Offices may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination by the Offices, the Company shall not be required to implement any contested recommendation(s). With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred twenty (120) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Offices.

19.     The Monitor shall undertake a second follow-up ("third") review not later than one hundred fifty (150) days after the issuance of the second report. The Monitor shall issue a third report within one hundred and twenty (120) days of commencing the review, and recommendations shall follow the same procedures described in Paragraphs 16 through 18 above. Following the third review, the Monitor shall certify whether the Defendant's

Compliance Programs, including its policies and procedures, are reasonably designed and implemented to prevent and detect violations of laws prohibiting money laundering, laws requiring anti-money laundering programs, and laws prohibiting violations of U.S. sanctions. The final review and report shall be completed and delivered to the Offices no later than thirty (30) days before the end of the Term. If, by the third review, the Monitor assesses that the Company's Compliance Programs are not reasonably designed and implemented to prevent and detect violations of laws prohibiting money laundering, laws requiring anti-money laundering programs, and laws prohibiting violations of U.S. sanctions, the Offices may, in their sole discretion, declare a breach or extension of the Agreement or the Monitorship

*Monitor's Discovery of Potential or Actual Misconduct*

20.    Except as set forth below in sub-paragraphs (b), (c) and (d),

a.    Should the Monitor discover "Potential Misconduct" during the course of his or her engagement, which means a high likelihood that:

i.    An individual who has been convicted of a crime related to the conduct set forth in the Statement of Facts in Attachment A to the Agreement has participated, directly or indirectly, formally or informally, in managing or operating the business of the Company;

ii.    The Company or its personnel have selectively enforced know-your-customer and customer due diligence policies and procedures;

iii.    The Company or its personnel have willfully failed to implement an effective anti-money laundering program;

iv.    Specific violations of money laundering, anti-money laundering, and U.S. sanctions laws—post-dating or not disclosed in the Agreement—may have occurred or may be ongoing;

<ol type="a" start="5" style="list-style-type: lower-roman">
</ol>

v. The Company is doing business with or permits customers to conduct transactions with designated persons, entities, groups, industries, regions, and countries targeted by U.S. sanctions laws;

vi. The Company is knowingly permitting customer accounts to conduct unlawful activity including to transact with proceeds of unlawful activity or hold property blocked under U.S. sanctions laws.;

vii. The Company's technological controls to prevent circumvention of the Compliance Programs, described in Paragraph 7 of Attachment C, may be ineffective;

viii. Real-time transaction and account monitoring may be ineffective;

ix. The Company may have maintained false books, records or accounts; or

x. The Company has intentionally withheld relevant information from law enforcement or regulators,

the Monitor shall immediately report the Potential Misconduct to the Binance Chief Compliance Officer for further action, unless the Potential Misconduct was already so disclosed. The Monitor also may report Potential Misconduct to the Offices at any time and shall report Potential Misconduct to the Offices when the Offices requests the information.

b.       In some instances, the Monitor should immediately report Potential Misconduct directly to the Offices and not to the Company. The presence of any of the following factors militates in favor of reporting Potential Misconduct directly to the Offices and not to the Company, namely, where—in the Monitor's good faith assessment—the Potential Misconduct: (1) poses a risk to U.S. national security, public health or safety, or the environment; (2) involves

senior management of the Company; (3) involves obstruction of justice; or (4) otherwise poses a substantial risk of harm.

      c.     If the Monitor believes that any Potential Misconduct or other misconduct has occurred that may constitute a criminal or regulatory violation ("Actual Misconduct"), the Monitor shall immediately report the Actual Misconduct to the Offices. When the Monitor discovers Actual Misconduct, the Monitor shall disclose the Actual Misconduct solely to the Offices, and, in such cases, disclosure of the Actual Misconduct to the Binance Chief Compliance Officer should occur as the Offices and the Monitor deem appropriate under the circumstances.

      d.     The Monitor shall address in his or her reports the appropriateness of the Company's response to disclosed Potential Misconduct or Actual Misconduct, whether previously disclosed to the Offices or not. Further, if the Company or any entity or person working directly or indirectly for or on behalf of the Company withholds information necessary for the performance of the Monitor's responsibilities and the Monitor believes that such withholding is without just cause, the Monitor shall also immediately disclose that fact to the Offices and address the Company's failure to disclose the necessary information in his or her reports.

     21.     Neither the Company, nor anyone acting on its behalf, shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

*Meetings During Pendency of Monitorship*

     22.     The Monitor shall meet with the Offices within thirty (30) calendar days after providing each report to the Offices to discuss the report, to be followed by a meeting among the Offices, the Monitor, and the Company.

     23.     At least annually, and more frequently if the Offices deem it appropriate, representatives from the Company and the Offices will meet to discuss the Monitor and any

suggestions, comments, or improvements the Company may wish to discuss with or propose to the Offices, including with respect to the scope or costs of the Monitor.

*Contemplated Confidentiality of Monitor's Reports*

24.     The reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the Monitorship. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent the Offices determine in their sole discretion that disclosure would be in furtherance of the Offices' discharge of their respective duties and responsibilities or is otherwise required by law.